We'll hear argument this morning in Case No. 161140, the National Institute of Family and Life Advocates v. Becerra. Mr. Farris? Mr. Chief Justice, and may it please the Court, California took aim at pro-life pregnancy centers by compelling licensed centers to point the way to an abortion and imposing onerous advertising rules on unlicensed centers that do not provide ultrasounds or any other medical providers who serve pregnant women. This law targets a particular topic of discussion, employs compelled speech, and is directed at disfavored speakers with disfavored viewpoints. What would be the situation, take the other side, if the state law were that all women's health providers that perform abortions would have to tell the patients that they're pregnant? If you would like to carry the pregnancy to term, you will have access to a clinic that will assist them, provide adoption facilities they might contact, or provide instruction on how to care for infants. Suppose that were the statute. Would that be unconstitutional? No, Your Honor. This Court decided a very similar case in the Casey decision from Pennsylvania. Pennsylvania imposed that requirement in the context of an informed consent discussion. Informed consent is triggered by a doctor proposing to perform a particular medical intervention. Medical interventions are surgeries. Abortion is a medical intervention. And in that case, medical interventions require the discussion of the benefits of the procedure, the risk of the procedure. But why isn't this also informed consent? Well, Your Honor So that the patient will know what are the array of services available to her. Your Honor, the services provided by our licensed centers are not medical interventions. Perhaps the best explanation is if Planned Parenthood Center in Pennsylvania did pregnancy tests and ultrasounds, but did not perform abortions, requiring that Planned Parenthood Center, they talked about abortion, encouraged abortion. That would be unconstitutional to compel them to give this disclaimer, because it's not a procedure. Justice Ginsburg can protect her own question, but I was interested. Her question is a hypothetical case. Yes. The hypothetical case is doctors who are offering abortion services have to say that if the pregnancy is carried to a full term, there's assistance. Your Honor, that would be It's a hypothetical case. I understand, Your Honor. If the State anchors that in the informed consent framework, then it would be considered under the Cayce legal principles, because in Cayce, this Court recognized that It doesn't anchor it under any, it just, that's what the law is, what it says. If you are an abortion provider, you have to tell patients that if they want to carry the pregnancy to term, they can have assistance, call this number. Your Honor, yes. That is in the context of proposing a medical intervention, describing the alternatives. This Court in Harris v. McCrae and in Cayce indicated that the State has an additional interest beyond the health of the woman in the interest of advancing the life of the unborn child to a degree. It can't go too far. Kagan. But you're saying that if there is a nonmedical facility, I mean, I don't want to put words in your mouth, this is a question, if there is a nonmedical facility, that the State has reason to think is telling women about only one set of options and not another set of options, but here, the case would be they're only telling women about abortion providers, and they're not telling women about other ways that they may be able to complete their pregnancy, that the State could not impose a requirement that that facility post a notice saying, in fact, there are many kinds of facilities in the world, and some are abortion providers, and some are crisis pregnancy centers, and some are something else, that that would not be permissible? Your Honor, that would be, since it's in an unlicensed facility that the requirement is being framed up, that would be judged under strict judicial scrutiny, and I don't believe it would be required. If in the licensed context, however, it would still be the same framework, but the analysis would be slightly different, because it's here, in this case, it's being licensed. Kagan. I guess I'm not sure licensed, unlicensed. You were suggesting that everything turned on whether a medical procedure was going to be performed, and my hypothetical was designed to take out the medical procedure. In other words, this is a facility that just refers women, but it refers women only to abortion providers. And the State decides, we don't want facilities that refer women only to abortion providers. We want facilities that will tell women about the full range of their options. And so the question is, would a requirement that such a facility post a notice saying there actually are a lot of options and here's how you can access them, would that be unconstitutional? Yes, Your Honor, because under your hypothetical, it's a targeted law. It's aimed at particular people and not given to all doctors who diagnose and confirm pregnancies. Well, what if it wasn't targeted? What if there were a State law that required every doctor or facility that provides medical treatment for pregnant women to post a notice setting out the full range of options available to those women and where they might obtain services at no cost if those are available? Would there be anything wrong with a law like that? Well, Your Honor, if it's done in a manner similar to what's being done here in California, to require pro-life doctors, whether in a clinic or otherwise, to point the way to an abortion facility and to facilitate abortion would be constitutionally problematic. What if it did that to – what if this notice provided for – set out all of the options and it applied to everybody? So it would apply to pro-life facilities, but it would also apply to clinics that perform abortions. I understand. And provide no other form of assistance for pregnant women. Your Honor, I think the outcome would still be the same. Perhaps it would arise under free – I'm sorry. The outcome would still be the same? That's my prior answer. I'm sorry, Your Honor.  And that is it would be unconstitutional to require that statement to a doctor who is pro-life principally because of the free exercise issues that would arise in that case. But this case is different, because not only is the requirements of which doctors have to give the notice gerrymandered, the notice itself is gerrymandered. It is not giving women all their options. The notification required says that the State will pay for abortion services, but it does not tell California women it will pay for pregnancy. There are a lot of different things. I mean, the simple, basic thing, if you can just say it as simply as possible. In law, as you well know, what is sauce for the goose is sauce for the gander. And so I think what's bothering from these questions, people, as it bothers me, there are pro-choice states and there are pro-life states. All right? So if a pro-life state can tell a doctor, you have to tell people about adoption. Why can't a pro-choice state tell a doctor, a facility, of whatever it is, you have to tell people about abortion? See, that's simple. The one we've said, you can make a doctor who is very pro-life tell her about abortion. Okay, get it? And why don't we have to say, to keep sauces the same, now you're a pro-choice state, then you can make these people tell them about abortions. Your Honor, if it is simply a line of demarcation about your position on abortion, that would be unconstitutional in any state. But the laws that have been upheld are doctors who are going to perform abortions, not doctors who can- All right, so you want to draw a line as to whether it's actually the doctor, medical treatment, about to do it, as not. Yes. Okay, I got it. My other question, and it's the only other one I have, is you have a totally different line in which you are attacking this. And that is, you say, which is certainly a point, that this statute picks out 60 to 70 really pro-life facilities. And says, you have to post these signs, but nobody else does. Right, isn't that basic? That's correct, Your Honor. Okay. Now, that sounds like you have a point there, if that's correct. But doesn't there have to be a trial on that? What did you argue to, this is just a preliminary injunction, don't you have to have a trial or present some evidence? I don't know what your evidence is. I don't know what the evidence is on the other side. And can we decide that without knowing the evidence? Well, Your Honor, the gerrymandering of the statute is evidence from the face of the statute. The way the statute works is that it begins by only regulating clinics that are licensed under section 1204 of the California Code. That is limited principally to non-profit community clinics. So all doctors in private practice are out of the statute to begin with, and the State admits this in its brief. Additionally, among those non-profit clinics, the clinics that are in general practice are exempted out, even though they serve pregnant women. Then you take the class, the last gerrymandering in the statute is among those that are principally giving pregnancy services. If you're willing to sign up for the State's Family PAC program, which requires you to dispense abortifacient drugs, then you're out of the program as well. So through a clever series of legislative gerrymandering, the State has ended up with the result that only non-profit pro-life pregnancy centers are required to post the notice. And the notice itself is biased. Along those lines, one other question occurs to me that's similar to Justice Breyer's with respect to the adequacy of the record we have for unlicensed clinics. We don't have a lot of evidence with respect to the nature of the burden that would be imposed by the 48 font requirement on all ads. There's some evidence in the amicus briefs that it might be like a $9,000 a month tax for advertisements. But what do we do about the lack of a record here and whether we should wait for an as-applied challenge, as the government suggests? Your Honor, this court faced a similar situation in the Ibanez case, where there was a detailed disclosure required in a certain financial profession. And this court didn't have a financial record. It didn't have a financial record in the Miami Herald case either. We just simply read the statute and made common sense inferences. In the advertising context, the rule is the font must be larger than the main body of the ad or the same size as the main body of the ad with special fonts and colors. If that's the case, think of a Chevrolet ad where the warnings about or the disclaimers about financing had to be as big or bigger than the word Chevrolet. That is not an effort to inform people. That's an effort to clutter the ad and drown out the message of the ad. Ginsburg. Can we separate? Ginsburg. We don't know what kind of adjustments might have been made because this case went off without any kind of evidentiary hearing, as was pointed out. But to test what your position is, suppose the law had been simply the people who don't provide abortions or contraceptive services would have to say, we don't perform abortions and we don't provide contraceptive services, period. Then that would be, everybody would know what's being offered. Would that be constitutional? Not if it's done in a targeted fashion. Again, if all doctors in California who treat pregnant women are under the same requirements, but when there's special imposition upon a targeted group of people because they don't like their position on abortion, that is the form of targeting that this court outlawed in Sorrell. And that's what's going on here in California. Counsel, can you please explain to me what the difference is between the licensed and unlicensed in terms of the services? Certainly. And then I have a question based on that. But you seem to be basing your argument on the point that at least the unlicensed people are not providing procedures, correct? They're not providing any medical services. Well, they are advertising themselves. I looked at one, a few of them, and exemplary of it is the Fallbrook Pregnancy Resource Center website, and it's – I'm fairly sophisticated. There's a woman on the homepage with a uniform that looks like a nurse's uniform in front of an ultrasound machine. It shows an exam room. The text of the page titled Abortion says, Fallbrook will educate clients about different abortion methods available and describe in medical terms different abortion procedures. The website also says clients will be evaluated by nurses and that they follow all HIPAA regulations, which if they're not a medical provider, they don't have to follow HIPAA. If a reasonable person could look at this website and think that you're giving medical advice, would the unlicensed notice be wrong? Your Honor, to answer the first part of your question, our unlicensed facilities do not provide any medical services being defined as – But they do provide medical advice. Well, they provide advice on the topic of pregnancy, which it basically – So let me ask you, how is that different from what a doctor does? When you go in for a pregnancy, you see the doctor, and the doctor will describe, hopefully, the benefits of a pregnancy and perhaps its risk. Because, depending, not all pregnancies are without complications. So this is consulting about a medical condition. How is that any different than Casey? You come in to talk to a doctor about abortion. The State says you have to tell the person the alternatives. Your Honor – So if you're going to choose to talk to people about, if you're an unlicensed facility, about pregnancy, why shouldn't you tell people that you're not a doctor? Well, Your Honor, in Casey, again, the doctors that were being regulated were the ones that were performing abortion. The Court made note in Casey that it upheld that requirement because it was parallel to the general practice of informed consent. Unlicensed people who talk to women say, you can choose parenthood, you can talk about adoption, they talk about the issue of pregnancy to be sure, but it's – So is it okay for – is it wrong for a State to tell agencies who give advice on immigration rights? There's a couple of States like this who say, if you're going to give advice on immigration matters, you better tell people you're not a lawyer. Those are unconstitutional? No, Your Honor. That New York statute that does that gives those immigration people who are required to give the notice the ability to intervene in cases and matters. That would otherwise be the practice of law. And so what that amounts to is similar to a statute referred to by the State in its brief where naturopaths and other alternative providers are clearly otherwise engaged in the practice of medicine, are allowed to do so if they give a disclaiming – Medicine is defined by the State. You need a license to practice medicine. True. In normal circumstances, but – So if you're giving people advice about pregnancy when you're not a licensed facility, please explain to me what is both misleading, incorrect, or suggestive in any way that a person has to do something, like go to this doctor – to a doctor. How is it doing anything other than telling people that despite how the picture looks on the website, this is not a medical facility? Your Honor, it is illegal in California to practice medicine without a license. It's illegal to pretend to practice medicine without a license. If that's what's going on here, surely California would have found a way to do that before now. Mr. Farris. Well, in this case, I didn't go beyond the record to look on the Internet because I don't think we should do that, but I do have a hypothetical. What would happen if an unlicensed entity, unlicensed center, just had a billboard that said, Choose Life, would they have to make the disclosure? Yes, Your Honor. All right. So they'd have to make a 20-line – or a 20-word – how many words in it? I forget. Right. It would be 29 words – Twenty – 29 words – In the same size font as Choose Life. In the same size as Choose Life. And in a number of languages, whatever is required by that county. Now, we can ask the State of California. Will the State of California disagree with that, do you think? I mean, you don't know. I don't think they'll disagree with that. Because it seems to me that that means that this is an undue burden in that instance, and that should suffice to invalidate the statute. Yes, Your Honor. That's our position. Mr. Farris, can I ask, you've been pinning a lot when you've tried to distinguish Casey on the idea of informed consent. And certainly some of the requirements in Casey are informed consent in the way we would understand that, talking about the risks of various procedures, all the things that we want doctors to talk about when we go to them and seek medical care. But there were definitely requirements in Casey that don't have much to do with informed consent as I've ever understood it. You know, the doctor having to inform patients about that medical assistance benefits may be available for childbirth and neonatal care, inform women that the father would be liable to pay child support. So those kinds of requirements, they just don't seem to have much to do about informed consent. And they are, and this goes back to Justice Breyer's sauce for the goose point, they're really the exact flip side of the requirements in this case. So how am I supposed to think about that? Your Honor, they are triggered by a medical intervention rather than, in this case, it's triggered by a discussion. Well, I realize that that's a factual difference, that there's a doctor in the room and in one case there's not. But these are not informed consent requirements. Well, Your Honor, this Court held they were in Casey because they were components of informing women about the alternatives to the abortion process. I see that my time has got to the point that I'd like to reserve the balance for rebuttal. Thank you, Your Honor. Thank you, counsel. Mr. Wall. Mr. Chief Justice, and may it please the Court, the First Amendment allows states to require truthful, factual disclosures about one's own goods or services. What the First Amendment does not allow and what California has done is to require pregnancy centers to make disclosures about services they do not provide and that violate their most deeply held beliefs without any showing by the State that it truly needs to compel speech rather than speak its own message. What about if the law were, instead, if you are providing women's health services, you have to list all the services that you provide. And that would apply to everybody. It would apply to facilities that provide abortion and contraceptive services. And it would apply to the natal care. Everyone. Like on food, you have to list all the ingredients. Yes, I think if California said to all providers across the board in the State, you've got to put a notice upon the wall that lists the services you provide, that looks to the United States like truthful, factual information about what you're doing. That seems like, you know, pretty close to the core of Zouderer. I think the concern here is that the license notice in California and similar statutes in two States, Hawaii and Illinois, are really different from the vast bulk of disclosure requirements like that one. I didn't understand the question to be along the lines that you've answered. It's not simply a requirement of whether or not the facility must list the services they provide. The question is, can they be required to list services that they don't provide, but that may be provided elsewhere? My question was, does everyone in the women's health care business, if the State decides, we want you to tell the public what you provide, what you provide, that's all. I may have misunderstood the question. To the extent the notice is about your own services, we think that is permissible. It's a truthful disclosure about your own services. As you move away from that in the way that three States have done, then I think you're triggering heightened scrutiny under the First Amendment. In your view, family planning clinics do not have to tell any woman about adoption. I think it depends on whether it's time. No, they don't provide adoption. It's not their service. As Petitioners were saying, if it is just a center that counsels people on abortion in a general sense, no, we'd not. No, it doesn't. It's a center that helps women plan their families. That's what it is. Now, it's not they don't have doctors who are performing abortions there. I'm just saying it's a family planning center. Okay? It's an information center. My point is the same. There are millions of people in this country who have views on this subject that are absolutely opposed one to the other. So that to me suggests the law should keep it as simple as possible. And that's why sauce for the goose, sauce for the gander. I mean, if the law is permissible, which says, doctor, you must tell the woman about adoption, then why shouldn't the law say, family planning center, you must tell the woman about abortion? Sounds even handed. Sounds as if everybody in the same business is out of the same rules. You, the government, and the NIFLA are trying to make a distinction there. And I need to know if you're right. The only distinction I hear so far is one has a doctor about to perform and the other has just a counselor. Is there any other distinction possible? Justice Breyer, that is the crucial distinction. I agree with you on the sauces for the goose and the gander. But when you are performing a medical procedure and you're making disclosures about your own services, what the plurality opinion in case he says is, this is a page 83. Yeah, it was about doctors. I agree with that. That's right. But I think for most people, you'd think family planning. You know, family planning. That's the category. And the woman will make a decision. And then the state can tell them some things they have to say. And we know they can tell them about adoption. They can make them tell them about adoption. So why can't they make them tell them about abortion? Because, Justice Breyer, that when you are going in to have a procedure and you've got to make certain disclosures, that's a disclosure related to the career service. Maybe we could let him finish the answer, please. That's a disclosure related to the service that you're providing. And then it's just a question of how much you have to disclose. And Casey drew that pretty broadly to say at page 83. But, Mr. Wall, why go ahead. I'm sorry. You've got to make an informed choice. And all the government is saying, we're not saying not goose for the gander. We agree. What we're saying is the more you get away from that kind of a disclosure that's about what you're doing with that patient or customer or client, the more scrutiny it ought to get under the First Amendment. But I think the question is, why shouldn't there be? A state says, you know what? This is the regime we want. We want to say to family planning clinics that they should put up a poster saying we do family planning. We do not do adoption. And we want to say to crisis pregnancy centers along the lines of petitioners here, we do adoption. We do not do family planning or abortion. And the state thinks that would be a good system. Because when a woman goes in to either one of these kinds of places, they'll know what's there and they'll know what's not there. And why would that be problematic? Well, I think because once it's no longer tied to the specific goods or services that the clinic or center or whomever is providing, then the more we ought to be worried that they're making you just advertise what other people are doing. And this case is even one step beyond your hypothetical. Because it's not even saying to the clinics, say what you do and don't do. It's saying, look, we want people to know about services that the state provides. Mr. Wall, how is that different than Casey? In Casey, we required doctors to hand out state-created materials telling the women about what services the state and others provided. Adoption centers, fathers had to pay things. Now, I think your distinction, and you keep repeating it, is these centers, I'm assuming both the licensed and unlicensed ones, are not doing procedures. But I don't know what an ultrasound is if not a procedure. I don't know what a pregnancy test is if not a procedure. I don't know how counseling on the pregnancy state is not part of medical advice in the same way a doctor gives it when he's considering an abortion procedure. I don't understand the difference. Both of them are doing medical-related procedures. And both are being asked, the Chief said there's a distinction in not advertising someone else's services. But in Casey, we permitted it. So please explain to me again why there's a difference here. So, Justice Sotomayor, I agree with everything you said in the back half there. And if California were coming in and saying, before you, licensed clinic, perform an ultrasound, you've got to provide certain information to make sure that's an informed choice by that woman to get the ultrasound in the face of risks and alternatives, then it's like Casey. And the question is just, how much disclosure do you have to provide? And Casey, I think, gives us important guidance on that. California's notice isn't doing that, at least on the licensed side. On the licensed side, it's not helping the women who come into the clinic make an informed choice to opt into one of the medical procedures. And I'm not disputing that ultrasounds and the rest are procedures that could trigger those kinds of disclosure requirements. It's saying we have a generalized interest in having them know that we provide some low and free cost services. And if that's their generalized interest, that's tailor-made to an obvious alternative, which is let the state do what pregnancy centers do and tell people about what it provides. Before your time expires, can I ask you something about your brief that troubles me? And that is the government's request that we recognize a new category of speech called professional speech, which is subject to a lesser standard of review. In this case, it's very important in itself. But adopting this new category of speech would have far-reaching consequences. And I'd like you to explain why that is consistent with Stevens and other cases where the Court has recently said, we are not going to recognize any new categories of unprotected speech, and how you would define the boundaries of professional speech. And there have been a lot of cases, there have been some cases on this in the lower courts. But just to take a couple of examples. Journalists are professionals. So would they be subject to this standard? How about economists? How about climate scientists? How about a fortune teller? The Fourth Circuit said that a fortune teller is a professional. How about somebody who writes an advice column for parents? Wouldn't we be getting into very dangerous territory if we do this? So, Justice Alito, there's a lot there, and I just want to make a few points, and I think the Third Circuit's opinion in King does a pretty nice job of this. The Court's already talked about professional speech. Now, it's often talked about it in the context of commercial speech, and it's lumped them together in cases like Zauder and O'Reilly. But what we tried to do in our brief was to say, look, they're similar doctrines, they overlap. But they have somewhat different origins. And historically, there are certain professions that are regulated. That wouldn't include fortune tellers. It wouldn't include economists or journalists. But it would include doctors and lawyers and maybe accountants. And so we do think that there is some room for the states, historically, in that area. And what we've tried to say is, whether it's Zauder or some equivalent for professional speech, if it's a disclosure about what you're doing, we should think that's a fairly low level of scrutiny. And the more that we shift away from that, even in the commercial and professional speech box, we may not get to strict scrutiny, but it is heightened scrutiny. And the State's license notice can't satisfy it. I would say, if the Court goes all the way to strict scrutiny, every corrective disclosure that a manufacturer has to make about some product that it's put out in the public that has a risk, I think would get strict scrutiny. And our concern is, that's going to dilute strict scrutiny, and we are concerned that's going to undermine the First Amendment. Roberts. Thank you, Mr. Wall. Thank you. Mr. Kline. Mr. Chief Justice, and may it please the Court. The interest served by the license disclosure is very much like that of the disclosure in Casey, promoting informed choice by a patient. More specifically, it allows — it empowers the woman by explaining that her financial and medical care, including full prenatal and delivery care that Petitioners do not themselves supply. And it gives her that knowledge in time to be useful, because pregnancy and medical care is extraordinarily time-critical. There is a sense when you read this statute, Mr. Kline, there's at least a question that arises as to whether this statute has been gerrymandered. So would you speak to that? Because if it has been gerrymandered, that's a serious issue. In other words, if, you know, it's like, look, we have these general disclosure requirements, but we don't really want to apply them generally, we just want to apply them to some speakers whose speech we don't much like. Your Honor, the disclosure is targeted at women who seek free care for pregnancy, not at any particular viewpoint. And clinics that, by their very licensing status, provide free or sliding-scale, low-cost pregnancy care are the ones where those women are going to be found and where this information is immediately useful to them. If you have a law that's neutral on its face, but then it has a lot of crazy exemptions, and when you apply all the exemptions, what you're left with is a very strange pattern. And, gee, it turns out that just about the only clinics that are covered by this are pro-life clinics. Do you think it's possible to infer intentional discrimination in that situation? Yes. That kind of hypothetical can support. Okay. So let me ask you about some of these exemptions, which I think are hard to understand. Why does this apply only to clinics whose primary function is providing service to pregnant women? You could have a small clinic. Let's say it has 30 pregnant women come in a month. But that's the primary thing it does. Then you could have a big clinic that has 100 pregnant women come in a month. But it does so many other things that pregnancy is not the primary concern. Why does the law apply to one and not the other? Well, Your Honor, that serves the purpose of having the disclosure mostly made in the context in which it's useful, as opposed to being made in a lot of contexts where it's not. And this Court has said that legislatures should be encouraged to apply speech requirements more narrowly when they can rather than wide. Well, I mean, I don't understand that. Why does it apply almost only to non-profits and not for-profits? If the purpose is to get this information out to poor women, don't you think there are examples of poor women who stumble into a for-profit facility? Wouldn't it be beneficial for them to know that they could get treatment at no cost through the state? Why are most for-profits exempted? Your Honor, as a category, for-profit clinics do not seem to treat primarily women who need free and sliding-cost care in the same way. Now, I will say it's always possible to imagine a new boundary for the law, but under intermediate scrutiny, a law does not need to be perfect, and a legislature can concentrate its efforts at where the need for the law is most apparent. What about individual doctors? Why are they exempt? Your Honor, individual doctors specialize as a category in treating people who have a way to pay for care, whether they're already enrolled in Medicaid or health insurance or whether they just have the finances. Free clinics are not on the same page. See, when you put all of this together, you get a very suspicious pattern, and I don't know that we need to go into statistics about what the percentage of covered clinics are pro-life and what are not, but we do, we have an amicus brief from a party in the state court case where the state court held that this law is unconstitutional, and according to their statistics, 98.5 percent of the covered clinics are pro-life clinics. Do you dispute that? Yes, and I understand we're speaking outside of the record here, but that amicus evidence in the state court did not — was off by, I think, a factor of 10 in terms of how many covered non — I mean, it differed by a factor of 10 when it told the state court how many covered non-antiabortion facilities there were. So what is your position on that? What's the percentage? Your Honor, the State does not have firm numbers on this. We have done a preliminary assessment which found a significant number of non-antiabortion covered facilities. However, I will also say that deriving this from purely State databases is very tricky because they rely on self-reporting that's hard to interpret as to who really does primarily pregnancy care. It's exactly the kind of thing where a record would be useful. Well, could you say a few words about how these boundaries came about? In other words, you have these various lines that the statute draws, and then it has these exemptions. And what was the State thinking? I mean, you know, and I realize that the State — you know, there are lots of people who were thinking different things, but is there a — give me a little bit more about your theory of the case, even, as to why these exemptions exist and why these lines are drawn. You've been saying, well, we go where the problem is. But tell me how you knew where the problem was. Tell me how — what you thought the problem actually was. What were you doing? What were you trying to do? Well, let me start with the question of what the problem is. And the problem is that the State has overseen — the State legislature has overseen an expansion of public medical care in California. But it's experienced that publicity campaigns invariably leave a gap that was highly concerning to them in the pregnancy context because of the medical issues and because of the severe timing constraints to get care that makes a difference. And so the goal of the statute is to identify women who are seeking pregnancy care and appear unable to pay for it themselves or through insurance or public coverage they already have. That's why it's targeted at free clinics. Now, there was a reference to exemptions. And the exemption — leaving aside the exemption for federal clinics, which I think is obvious — the exemption for Medi-Cal FPAC providers reflects that a notice would serve little purpose at a provider which already provides care under those programs and which has the incentive to help women enroll in them. One way to think about how a statute like this gets enacted is to say we're — you Low-income women don't have a lot of access to information, don't realize what all their options are, want to make sure in general and across the board that they get the best information that's available to them. Another way to think about what the problem is and how a statute like this comes about is more targeted. It's to say there are these crisis pregnancy centers all over California and we know that women just go into them and they don't realize what they are and they're being subject to being misled and we think that this is a terrible problem. And it might be that, you know, that the state could legitimately view that as a problem. It's a much more targeted problem. Whether it's a problem or not, it's much more targeted than the first. And I guess what I'm asking is, is this the second kind of statute or is it the first kind of statute? It's the first kind of statute. And the author's verbatim statement — If it's the first kind of statute, then why shouldn't this court take cognizance of the state's other available means to provide messages? If it's about just ensuring that everyone has full information about their options, why should the state free ride on a limited number of clinics to provide that information? Well, Your Honor, the state — the legislature is aware of the shortcomings of other methods, as evidenced by the gap that has remained despite their efforts to publicize. Now, what you describe as free riding, I respectfully submit, is a permissible speech requirement in the professional context. Well, but if you're trying to educate a class of persons about their rights, it's pretty unusual to force a private speaker to do that for you under the First Amendment. Your Honor, I don't think it's unusual to require a professional to explain alternatives as — or additional options that are available, as in Casey, and also as in the laws that have been cited in our brief, the New York brief. Well, put aside — Counsel, maybe — I'm sorry. Maybe you could finish your answer to Justice Kagan's question. Let me ask first what is the part of Justice Kagan's question, so you at least — I don't even remember which was the first kind of statute anymore and which was the second kind of statute. But I was saying a state could really be responding to a sort of generalized — a feeling that, in general, poor women don't have access to information, or a state could be responding to a feeling that there are a particular kind of a center that is misleading women as to what they do and don't provide. And I can see this statute arising in either of those two ways and wanted you to tell me why you thought it arose in the first way and not in the second. Right. Well, let me say I don't think they're exclusive. The primary issue is women not knowing where they can get the free care they need for all of their options, including carrying a healthy pregnancy to term and having a healthy baby. But obviously, the informational problem is going to be especially concerning where there are cases of deception and so forth. And the legislature had some awareness of this, but they didn't draw a statute with that as the primary — You see, that's what I give up on. I don't know. I came away from these briefs, and I think I got the impression that there are about 60 or so centers, maybe 70, that are really pro-life for religious reasons of different kinds. All right? And they don't want to talk about abortions. And then it seemed to me maybe there are a thousand centers altogether in California or several hundred. And I really did end up wondering, well, in all those centers, do the poor women really get the information about free abortions? I have no idea. I mean, the fact that they may have a medical thing doesn't mean they tell everybody about it. I don't know what they're like. So this is my question. Don't we need a trial on this? And I don't see — I mean, I'm just telling you right now I have no idea, and your answers don't tell me they're not empirical. You haven't told me whether women who don't go to these 67 centers but do go to, say, 700, are all informed, whether the center is a member of the Cal medical program or not. I don't know whether they're all informed. And I suspect that you don't either. And therefore, I think trial, that's what they're for. What's the answer to that? Your Honor, we agree. You agree with that? And the record at the preliminary injunction stage, which is all this concerns, was not sufficient to support an injunction. At a merit stage, there would presumably be a great deal of evidence on both sides. Mr. Klein, can we go back to the question Justice Kennedy asked the other side, which was for you to affirm or disaffirm that if one of these facilities wrote an ad that just said pro-life and put their name, it appears as if the law would require them to have the statement, this is not a medical facility, in 48 point font? I don't think so, Your Honor, unless the facility was — I mean, what subjects a facility to the law, if it's unlicensed, is — are — this is on page 79A of the Petitioner's appendix — are things like offering obstetric ultrasound sonograms. Right. Well, what if it weren't? We're dealing with the more general principle. What if you had an organization that simply provided adoption services and advertised there is an alternative to abortion, try adoption? Could the State make them include the disclosure requirement that you have with respect to licensed facilities? Because that's an alternative to pregnancy, I would say you'd want to make all the abortion alternatives also fully available and make the low-income women aware of those. Could you impose that requirement on that facility? I don't think so, Your Honor, and it wouldn't — and such a requirement wouldn't be serving the same interest, and let me explain why. These — the licensed facilities provide medical care. Page 91 of the Petitioner's appendix, their complaint describes medical care they provide to pregnant women. And so women go there. So what additional — what, ultrasounds or discussion of family planning? What more would it take to require the adoption center to be covered? Any one of the ones that you have listed for licensed centers? In other words, what would make it subjected to the same kind of requirement as a licensed center? Yeah. At what point, you know, you say — let's say that ultrasounds are out of it. Is the disclosure still required for that facility? I don't think the ultrasounds per se make the difference. What would make the difference as a constitutional matter is, is it licensed as a medical facility and does it provide medical care to people who — Pregnancy testing? If the adoption center also provided pregnancy testing, could you cover them? If it provided it as a — as a licensed medical service through licensed medical providers, then the State would have to justify the sufficiently important State interest with the — and the — What's your — what's your answer, though? It provides two services, adoption and pregnancy testing. Could you impose the disclosure requirement on that facility? Your Honor, I think it would be much more difficult to justify that. I know. That's why I'm asking the question. Right. I'm trying to figure out — I'm trying to figure out the limits of your argument. I mean, the — the centers here have a variety of services they provide, and you say because of that, we can impose this requirement on them. Now, before we can say yes or no to your argument, I would like to know the limits of it. So a facility that provides adoption services and pregnancy testing, can they be covered by your law? Through a licensed provider, yes, they could, except — No, that's all they do. I don't know what you mean by through a licensed provider. That is all they do. They counsel on adoption and they provide pregnancy testing. Could you require them to say, look, there are other options you may want to consider, and therefore, here's a disclosure saying, you know, here are the facilities where you can get other options? On reflection, I think probably not. And here's the difference, because they're providing a — a so much more limited set of medical services, that it may be less — less human. Mr. Klein, can we go back to my question? I have read the law with respect to facility, and it requires a facility to do one of — two of four things before it qualifies under the law. So, Borshin, you appear right that they have to, one, offer ultrasounds, obstructed sonograms or prenatal care, pregnancy or pregnancy testing or diagnosis, or three, prenatal monogram tests or pregnancy, and four, collect health data. But they have to do two or more of those things. But let's go back to the question Justice Kennedy asked. One of these medical care facilities says Pro-Life and their name. Is that — are they required to post a notice? And you started by answering the question, and I don't think you finished. And the answer is no, they're not required to. Because they're not offering in the advertising one of these services? Because they're not — right. They're not doing two of the covered — No, that's not — show me where that is in the statute. If it's a covered facility, then any ad that they put out, including one that just says Choose Life, has to — it has to include this disclaimer, we're not licensed. But in order to be a covered, unlicensed facility, it has to do two or more of the list of things. Yes, it has to do those things. So you have a facility that offers pregnancy testing, and they advertise that they offer pregnancy testing. That's all they do. And they put up an ad that says Choose Life, they have to put in the disclaimer. If — yes, in that circumstance, they may be required to do that. And — Do you agree that mandating speech that the Speaker would not otherwise give, indeed does not agree with, alters the content of the message? Yes, it does, Your Honor. All right. So then you're saying that on this billboard, you — the State can require that the message be — the content of the message be altered. Even though they're not providing medical services. Yes, Your Honor, because the criteria are designed not to see who's providing medical services. That's taken care of by our unlicensed practice law. It's designed to address instances where the services that are offered and provided could make a woman believe that she's going to have — be accessing medical services and is spending her time and resources to — to do that, and is unable to evaluate what she's getting. Now, if we uphold your — your argument, if we agree with your argument, could the State then amend its statute and say that any evangelical group that has a seven-day rally for pro-life has to give required information of this sort? No, Your Honor, I don't think that would follow at all. Why not? Well, and even putting aside the — the free exercise targeting, the — Oh, so religion is not a part of this calculus in the case that you have? Well, Your Honor, your hypothetical statute did target at evangelical groups. That is on its face, unconstitutional. So I'm assuming we want to take that out. It didn't target it. It included it. So I think the statute is reasonably read and applied in — in recognition of its purposes, which are the purpose to prevent women from making their decisions about where to go based on mistaken confusion about what's offered. That's a classic Zouderer purpose. Now, if an — May I ask — there was a question raised about 13 different languages and what a burden that — that would be. I don't know what the State's answer to that. It means one thing just to say that we are not a licensed medical provider. But if you have to say that, those two sentences in 13 different languages, it can be very burdensome. Your Honor, if the statute — if in application to a kind of ad that the Centers otherwise have been running and would run, if it makes it too burdensome to place those ads, the statute would be unconstitutional as applied to that. That would be — Well, what is the situation for Los Angeles County? This is California law. You should know the answer. Somebody is going to put up an ad, a covered, unlicensed facility posts an ad in Los Angeles County, in how many languages must they print the disclosure — the disclaimer? It would be 13. And it would be — if a plaintiff showed standing and made a record of the kind of ad that — that they used to run and that it would be impossible to run it that way, it would be unconstitutional. But that requires actual standing and some kind of administration. What kind of an ad would — if it's a — what kind of an ad would — as to what type of ad would that not be unconstitutional? Well, Your Honor, there is nothing in the record about what ads these plaintiffs do, in fact, run. So we don't know. We do know this doesn't apply to TV and radio ads, for instance. I want to make sure, if I may, to address one point. So you want me to have a remand for them to tell the Court what a billboard is, because I don't know that? Your Honor, I — There's a lot of things we don't know, but I think we know what a billboard is. We don't know what ads these Petitioners or NIFLAS members run. It's not in the complaint. And for a preliminary injunction, the Court was not — and the language issue wasn't raised at all on preliminary injunctions. So the Court did not abuse its discretion with respect to that. But what about — I mean, there were legislative findings about false and misleading representations. Has California ever brought charges against any of these places for false and misleading advertising? I'm not aware that the State has. I believe that the City and County of San Francisco has, for instance. But in any case, that doesn't address the — such a procedure would not be superior. First, that kind of — policing that kind of issue would not necessarily be more speech protective, since it might involve undercover patients, record subpoenas, site visits and the rest. But it would have the virtue of applying evenly to all persons and all industries and a law that is very familiar. I mean, anti-fraud provisions in commercial speech are well known and don't pose any of the problems we've been discussing today. So why wouldn't that be a superior mechanism for addressing these concerns, if we're talking about a narrower set of concerns, just anti-fraud concerns? Right. So the narrower concerns, which are not the only ones here, it could be significantly more — or at least it's an open question about whether it would be as or more speech intrusive to be really getting into everything that the Petitioners are saying to assess it, as opposed to requiring a two-sentence notice that mostly obviates the need for that, because it gives women the information to protect themselves and make informed decisions in the very limited time that they have available, simply by seeing the notice to call the government. The one is prophylactic and requires you to compel speech from someone else. That implicates First Amendment concerns. The second is, puts the burden on the government to prove that someone has abused their free speech rights. And this Court's normally pretty jealously protective of speech. So why isn't, again, that latter approach preferable? For the same reason that it wasn't a necessary step in Casey, because in the regulation of professional speech, the government, given the close and reliant relationship that the patient has on her physician, can require a certain amount of speech to ensure that the patient makes informed decisions about very important matters. The main difference from Casey is how much less burdensome this disclosure is, because there's more flexibility in how it can be delivered, and because it's only giving a phone number for the patient to call and get information from the government rather than requiring the physician to herself hand over a complete State-written pamphlet, which is what the disclosure in Casey required. Sotomayor, would it be fair to say, and I still don't have a full answer to my question. All right. Pro-life, nothing else. A unlicensed facility, it meets all of the criteria. Has it ad that says just pro-life and puts its name. Does it have to give the notice? Yes or no? Yes, if it meets the other criteria. And it's possible an as-applied challenge. That seems to me more burdensome and wrong. Because it's not tied to an advertisement that is promoting medical services. May I continue? It's possible that that kind of as-applied challenge would result in invalidating that application. But as in IADI, injunctive relief addresses particular problems. Thank you. Thank you, counsel. Mr. Farris, you have five minutes remaining. Thank you, Mr. Chief Justice. I'd like to first address Justice Kagan's concern about the gerrymandering issue. On page 5 of our reply brief in note 2, we point out the State's website for where the State tells low-income women how they can go to private doctors and get services for a pregnancy. Yet those doctors are all exempt from this act, as are all non-profit clinics that have the general kind of practice that Justice Alito's question described. As to the ad burden, the Amicus Heartbeat International on page 24 of their brief gave a mock-up of what an ad would look like. When you have simply a pregnancy, have questions, and a phone number, and all the language is required in Los Angeles County, that's what it would look like. And it's clearly burdensome. And the unlicensed center, I think the last answer from California was correct, is it would be triggered if they were otherwise mandated by the law. I'd last like to turn to the Court's comments on this matter. The answer was that this was not brought up in this case until now, and it should be aired below. Your Honor, that's not correct. It was raised below as our reply brief sets out. It's in the complaint. It's in the briefing in the district court. It's in the oral argument in the district court. It's in the briefing and oral argument in the court of appeals. All those details are on footnote 5 of our reply brief. The good for the goose, good for the gander concern, here's what's going to happen if California's law is upheld. A pro-life State is going to find out that there is no difference anymore between the people who perform abortions and those who counsel about it, who talk about it. If merely talking about abortion is sufficient to require you to give pro-life information, we have taken a big step in the wrong direction of politicizing the practice of medicine. If everyone who recommends abortion can have to give these kind of ---- Breyer, I mean, that's the sense of his mind. It's you have to be a professional group giving advice in a professional way. It's not ---- I don't think the goose and gander has to do with everybody in the world. It has to do ---- And there are things called family planning clinics, et cetera. Certainly, Your Honor. And so taking it on a narrow and then a broader construction. The narrow construction, as I understood your hypothetical, it was a family planning center that didn't actually perform abortions but did all the other services. I believe it would be unconstitutional in a pro-life State to require that center to give a pro-life kind of disclaimer that was required in Pennsylvania because they're not doing anything that relates to the practice of medicine in that context. But taking the broader construction, if we're not going to gerrymander this and say all doctors who treat pregnant women have to give all the options, if that's the case, doctors who advise to deliver and doctors who advise to get abortions are going to be swept into this requirement. And the political ramifications of that are enormous. We should not politicize the practice of medicine in that way. And the line that Casey drew between performing abortions versus advising about abortions is a constitutionally appropriate line. Thank you, Your Honor. Rest. Thank you, counsel. The case is submitted.